Reverend Joseph L. JONES, Plaintiff,

v.

**OFFICE OF THE COMPTROLLER OF
THE CURRENCY, Defendant.**

No. CIV.A. 96–1141(PLF).

United States District Court,
District of Columbia.

Oct. 23, 1997.

**198**

Reverend Joseph L. Jones, Opelousas, LA, for Plaintiff.

Joan Bernott Maginnis, Office of the Comptroller of the Currency, Washington, DC, for Defendant.

## OPINION

PAUL L. FRIEDMAN, District Judge.

This matter is before the Court on plaintiff's motion for preliminary injunction or summary judgment and defendant's motion to dismiss or for summary judgment. Upon consideration of the briefs submitted by the parties, the exhibits and declarations attached to those briefs and the administrative record, the Court denies plaintiff's motion for preliminary injunction or for summary judgment and grants defendant's motion to dismiss for lack of subject matter jurisdiction over the claims brought under the Fair Housing Act and over one of the claims brought under the Administrative Procedure Act. As to plaintiff's other APA claim, the Court concludes that defendant is entitled to summary judgment.

## I. BACKGROUND

Plaintiff is an African–American who founded the Plaisance Development Corporation ("PDC") to develop and increase the availability of adequate and affordable housing in an unincorporated, rural, poor and predominately African American community called Plaisance, next to the city of Opelousas, Louisiana. Complaint ¶ 23. Plaintiff is also a shareholder in First Commerce Corporation ("FCC"), a bank holding company. *Id.* ¶ 3. Plaintiff has sought loans to finance sewer improvements in the Plaisance community, but local banks, including First Acadiana National Bank, a subsidiary of FCC, have repeatedly turned him down. *Id.* ¶¶ 9–

10. Plaintiff alleges both intentional discrimination and disparate impact in lending by these local banks. *Id.* ¶¶ 11, 16, 52–57.

Defendant, the Office of the Comptroller of the Currency ("OCC"), is a federal agency and a bureau of the Department of the Treasury, charged under the Comptroller of Currency Act and the National Bank Act with chartering banks and with supervising the national banking system. The OCC also has responsibility for monitoring the compliance of national banks with fair lending laws that prohibit illegal racial discrimination. 12 U.S.C. §§ 1, *et seq.*, 21, *et seq.*, 481. The OCC accomplishes this mission chiefly through a staff of bank examiners who are distributed among six District Offices, including the Southwestern District Office in Dallas, Texas ("SWDO"). Def.'s Mem. at 2.

Title VIII of the Civil Rights Act of 1968, also known as the Fair Housing Act of 1968 ("FHA"), 42 U.S.C. §§ 3601–3619, prohibits discrimination in real estate lending. National bank examiners administer special compliance examinations that determine the level of bank compliance with this Act and several other laws touching the banking industry. If the OCC discovers instances of discrimination that violate the FHA or the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691f, in the course of these examinations, it is authorized to refer the matter to the Attorney General and request that an appropriate civil action be instituted. If the OCC does not refer the matter to the Attorney General, it must notify the Department of Housing and Urban Development of the suspected violation. *See* 15 U.S.C. § 1691e(k); Def.'s Statement of Material Facts at ¶¶ 3, 4. In the course of its regular periodic examinations under the Community Reinvestment Act of 1977 ("CRA"), 12 U.S.C. §§ 2901–2905, and in assigning CRA ratings to national banks, the OCC also considers a national bank's performance under the FHA. Def.'s Statement of Material Facts at ¶ 5.[1]

By letters dated August 30, September 6 and September 8, 1994, First National Bank of Commerce ("FNBC"), an FCC subsidiary, gave written notice to the OCC, as required by relevant banking regulations, that it planned to acquire Wolcott Mortgage Group, Inc. in the cities of Metarie and Slidell, Louisiana. Admin. Rec., Vol. 2, 1113–1114 (August 30, 1994 letter to Edward G. Graves, Director of Analysis SWDO of OCC, from Ashton Ryan, FNBC). On September 14, 1994, plaintiff sent the OCC a letter and a video tape that opposed the acquisition because of the alleged failure of FCC and its member banks to comply with the Fair Housing Act and the CRA. Admin. Rec., Vol. 2, 1077–1089.[2]

In its acknowledgment of Reverend Jones' letter, the OCC explained that the FNBC's notice of intent to acquire Wolcott was not subject to any rules allowing for public notice or comment and that the OCC therefore could not consider plaintiff's comments with respect to FNBC's acquisition of Wolcott Mortgage Group. Admin. Rec., Vol. 2, 646–47 (September 22, 1994 letter to Rev. Joseph Jones from Edward M. Graves, Director for Bank Analysis, OCC). In the same acknowledgment, however, the OCC informed plaintiff that his comments regarding FCC and its subsidiaries would be considered in the OCC's analysis of two pending merger applications submitted by FNBC and another FCC subsidiary, First National Bank of Lafayette. *Id.* at 1–2; *see* Def.'s Statement of Material Facts at ¶¶ 8–12. On September 26, 1994, the OCC made its final recommen-

---

1. "[T]he purpose of [the CRA is] to require each appropriate Federal financial supervisory agency to use its authority when examining financial institutions, to encourage such institutions to help meet the credit needs of the local communities in which they are chartered consistent with the safe and sound operation of such institutions." 12 U.S.C. § 2901(b).

2. In his letter to the OCC, plaintiff never directly asserts that First National Bank of Commerce has itself failed to comply with fair lending laws. Plaintiff's opposition to FNBC's acquisition of Wolcott is based solely on the alleged discriminatory practices of FCC and its unnamed "member banks". *See* Admin. Rec., Vol. 2, 1077–80 (September 14, 1994 letter to Karen Hardy, OCC, from Rev. Joseph Jones). With his September 14, 1994 letter, plaintiff included a letter dated October 18, 1993 from OCC Fair Lending Specialist Lawrence Riedman, which responded to plaintiff's previous allegations that First Acadiana National Bank, another subsidiary bank of FCC, had violated the FHA.

dation not to object to FNBC's acquisition of Wolcott and so notified FNBC. Def.'s Statement of Material Facts at ¶ 13.

Reverend Jones' September 1994 letter triggered a comprehensive investigation into his past and present complaints regarding FCC and its member banks. It also led to a series of communications between the OCC and plaintiff and to the OCC referring his complaint to HUD for further investigation. Def.'s Statement of Material Facts at ¶¶ 9–21. On December 6, 1994, OCC Southwestern District Office Compliance Director Gene Ferner and Compliance Examiner Craig Stone met personally with plaintiff in Opelousas, Louisiana. Def.'s Statement of Material Facts at ¶ 28; see Admin. Rec., Vol. 1, 76–77 (Memorandum dated Dec. 8, 1994 to Edward M. Graves, OCC, from Gene W. Ferner, OCC); 78 (E-mail dated Dec. 8, 1994 to Gene Ferner, Karen Hardy, Karen Pickering and William Suman, OCC, from Craig Stone, OCC). Mr. Ferner and Mr. Stone concluded that there was no evidence that the satisfactory ratings FNBC and First National Bank of Lafayette had received for compliance with the Community Reinvestment Act were inaccurate. Def.'s Statement of Material Facts at ¶ 29; see Admin. Rec., Vol. 1, 76–77. Mr. Ferner stated that "Reverend Jones did not present any new or additional hard, factual data to support the allegations detailed in his protests." Admin. Rec., Vol. 1, 77.[3]

The conclusions reached by Mr. Ferner and Mr. Stone echoed those of OCC Senior Compliance Attorney Horace Sneed when he considered the complaints Reverend Jones lodged in 1993 regarding the alleged FHA violations of FCC affiliate bank First Acadiana National Bank. By memorandum dated September 30, 1993, Mr. Sneed concluded that First Acadiana National Bank's conduct "does not indicate a failure to comply with the CRA," and that the OCC had uncovered nothing to establish any wrongdoing by the FCC subsidiary bank. Admin. Rec., Vol. 2, 1136–1137; Def's Statement of Material Facts at ¶¶ 25–26 .[4]

The OCC's Southwestern District Office verified that plaintiff's challenge to FNBC's acquisition of Wolcott was but one of a series of charges—all emanating from plaintiff—leveled against FCC and/or First Acadiana National Bank (another subsidiary of FCC), that were sent to members of Congress, the Board of Governors of the Federal Reserve, the Federal Reserve Bank of Atlanta, and/or the OCC. Admin. Rec., Vol. 2, 1090–93; 1108–12.

The OCC ultimately rejected plaintiff's allegations on the merits and accepted FNBC's notice of intent to establish an operating subsidiary. On January 10, 1995, the OCC also approved both of the merger applications submitted by FNBC and First National Bank of Lafayette. Admin. Rec., Vol. 2, 637 (September 29, 1994 letter to J. Miles Reidy, FCC, from Michael K. Hughes, OCC); Admin. Rec., Vol. 1, 54–57 (Jan. 12, 1995 letter to Thomas Callicutt, Jr., FCC, from Michael K. Hughes, OCC); 58–61 (Jan. 12, 1995 letter to Thomas Callicutt, Jr., FCC, from Michael K. Hughes, OCC); 62 (Jan. 12, 1995 letter to

---

**3.** Mr. Stone concluded: "While it could be argued that the local banks have not fully embraced the desires of Reverend Jones or his Plaisance Development Corporation they have to some extent attempted to reach out to the community and provide improved services ...." Admin. Rec., Vol. 1, 78.

**4.** Mr. Sneed further stated:

Although Reverend Jones has not obtained satisfaction from [First Acadiana National] Bank with regard to the request for $200,000 in interim financing for the sewer project [in Plaisance], the Bank's conditions for making the loan appear reasonable. Plaisance Development Corporation has virtually no assets. While Reverend Jones acknowledges that the corporation has insufficient assets to justify a $200,000 loan, he believes that interim financ-

ing could be provided on the basis of [a] pending grant [from the Farmers Home Administration]. However, a review of documents from FmHA indicates that the corporation must complete additional steps before FmHA will issue a commitment letter that would assure repayment of any interim financing.

The CRA does not contemplate nor require that a bank foresake prudential lending standards in order to satisfy the convenience and needs of the community. The statute provides that the appropriate federal regulatory agency shall assess each institution's record of meeting its community's needs "consistent with the safe and sound operation of such institution." 12 U.S.C. § 2903(1).

Admin. Rec., Vol. 2, 1136.

Rev. Joseph Jones from Karen E. Hardy, OCC); Def.'s Statement of Material Facts at ¶ 30.

On June 27, 1995, HUD closed plaintiff's complaint (forwarded to HUD by the OCC) against First National Bank of Lafayette. Def.'s Statement of Material Facts at ¶ 31; Admin. Rec. at 1.[5]

This case is plaintiff's second court challenge to the OCC's approval of FNBC's subsidiary acquisition and the OCC's failure "to perform its duty" under the FHA. *See* Petitioner's Response in Opp'n at 13; Def.'s Opp'n at 1. Plaintiff brought his first challenge to the United States Court of Appeals for the District of Columbia Circuit. *Jones v. Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corp., Office of the Comptroller of the Currency, and Dep't of Housing and Urban Development,* D.C.Cir. No. 95–1359, 1995 WL 759226. By Order dated November 15, 1995, the court of appeals granted respondents' motion to dismiss that action without opinion.

Plaintiff is proceeding *pro se* and appears to object to: (1) the OCC's approval of First National Bank of Commerce's application to acquire an operating subsidiary (Wolcott Mortgage Group, Inc.) in the vicinity of plaintiff's residence; and (2) the OCC's alleged general failure to promote fair housing. *See,* e.g., Compl. ¶¶ 13, 20, 52, 59. Construed liberally, plaintiff's complaint is: (1) an action under 42 U.S.C. § 3613 to remedy discriminatory housing practices by the OCC; (2) a private right of action to remedy OCC's alleged failure to satisfy 42 U.S.C. § 3608(d); and (3) an action under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.,* alleg-

ing arbitrary and capricious or otherwise unlawful action by the OCC.

Plaintiff seeks the following relief: (1) a declaration that the OCC's non-enforcement of the FHA, including its failure to promulgate regulations for the statute's implementation, constitutes a deliberate and reckless disregard for the rights of African Americans; (2) an injunction against such non-enforcement of the FHA; (3) a direction to the OCC to submit for this Court's approval a detailed plan to affirmatively promote fair housing; and (4) a reversal of the OCC's September 29, 1994 decision to approve the FNBC acquisition of Wolcott. Complaint at "Wherefore" Clause.

## II. DISCUSSION

### A. *Jurisdiction*

Defendant maintains that plaintiff's complaint should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure because the Court lacks subject matter jurisdiction to grant relief.[6] Defendant also argues that summary judgment should be entered in its favor because it is entitled to judgment as a matter of law under Rule 56 of the Federal Rules of Civil Procedure. The Court will first analyze defendant's assertion that this Court lacks subject matter jurisdiction.

#### 1. *Alleged Violations of Section 3604 of the FHA*

The Fair Housing Act provides that "it shall be unlawful ... [to] make unavailable or deny[] a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). Any "aggrieved person" who claims to have been

---

**5.** At some point, the OCC forwarded copies of one of plaintiff's complaints regarding the First National Bank of Lafayette to the Department of Housing and Urban Development. HUD notified plaintiff by letter of June 27, 1995 that his complaint had been closed because

[t]he "quality of life" factors, which form the basis of your complaint, are not covered by the Fair Housing Act, as amended, under the facts and circumstances of your case. The alleged discriminatory conduct of the Bank does not discriminate against you or the residents in the terms or conditions, or privileges of sale, or the services or facilities in connection with the

sale of housing; or otherwise make housing unavailable to you, or the residents. Similarly, the action of the Bank does not deny you, or the residents the opportunity to purchase, improve, repair, or maintain any dwelling. Consequently, the Department lacks jurisdiction in your case.

Admin. Rec., Vol. 1, 1 (June 27, 1995 letter to Rev. Joseph Jones from Gregory Bernard King, HUD).

**6.** Defendant also argues that plaintiff has failed to state a claim under Rule 12(b)(6), Fed.R.Civ. P., but the Court need not address that issue.

injured by such "discriminatory housing practices may bring a civil action in a United States district court" under Section 3613 of the FHA. *See* 42 U.S.C. §§ 3602(f), 3602(i), 3613.

Plaintiff argues that the language of Section 3604 extends to the alleged failures of the OCC to provide fair housing. Plaintiff is correct in pointing out that certain courts have been fairly liberal in interpreting the reach of Section 3604. *See NAACP v. American Family Mutual Ins. Co.*, 978 F.2d 287, 297–301 (7th Cir.1992) (discriminatory denial of insurance prohibited by Section 3604); *McDiarmid v. Economy Fire and Cas. Co.*, 604 F.Supp. 105 (S.D.Ohio 1984) (same); *Laufman v. Oakley Bldg. & Loan Co.*, 408 F.Supp. 489 (S.D.Ohio 1976) (discriminatory denial of financing prohibited by Section 3604(a)); *but see Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419 (4th Cir.1984) (discriminatory denial of insurance not prohibited by Section 3604(a)). In all of these cases, however, the entity sued for alleged discrimination was an actor directly involved in providing housing or providing services, like homeowner's insurance or financing, that are directly connected to helping people acquire housing.[7] By contrast, defendant in this case merely supervises the financial institutions that provide credit.

■ Defendant has provided neither housing nor housing-related services to consumers, or to plaintiff in particular; it therefore could not have denied housing or made it unavailable to anyone. The impact of alleged discriminatory practices by the institutions the OCC supervises cannot be attributed to the OCC itself. The OCC's activities thus cannot fall within the strictures of Section 3604. *Cf. Clifton Terrace Assoc., Ltd. v. United Technologies Corp.*, 929 F.2d 714,

719–20 (D.C.Cir.1991) (alleged discriminatory refusal by third-party contractor to service elevators not prohibited by Section 3604(a)). In the absence of any direct participation in the provision of housing or housing services, the OCC cannot engage in discriminatory housing practices under Title VIII and plaintiff may not proceed against the OCC under 42 U.S.C. § 3613.[8]

### 2. *Alleged Private Right of Action to Enforce Section 3608(d) of the FHA*

The Fair Housing Act also includes the following provision:

> All executive departments and agencies shall administer their programs and activities relating to housing and urban development (including any Federal agency having regulatory or supervisory authority over financial institutions) in a manner affirmatively to further the purposes of this subchapter . . . .

42 U.S.C. § 3608(d). Plaintiff argues that there is an implied private right of action against any federal agency that fails to meet its responsibilities under this provision of the FHA. *See Young v. Pierce*, 544 F.Supp. 1010, 1017–19 (E.D.Tex.1982).

■ The majority of courts that have considered this issue have concluded that there is no implied private right of action under Title VIII and that an aggrieved person not expressly granted the right to sue under Sections 3602 and 3613 of the FHA must seek relief not under Title VIII, but under the APA. *See e.g. NAACP v. Secretary of Housing and Urban Development*, 817 F.2d 149, 154 (1st Cir.1987); *Latinos Unidos De Chelsea v. Secretary of Housing and Urban Development*, 799 F.2d 774, 792–93 (1st Cir.

---

**7.** The court in *American Family* read Section 3604(a) together with Section 3604(b), which makes it unlawful to discriminate against any person "in the provision of services or facilities" in connection with the sale or rental of a dwelling. *NAACP v. American Family Mutual Ins. Co.*, 978 F.2d at 297; *see* 42 U.S.C. § 3604(b).

**8.** Plaintiff also argues that 42 U.S.C. § 3613 can be used to enforce 42 U.S.C. § 3608(d), which requires all executive departments and agencies to "administer their programs and activities relating to housing and urban development . . . in a

manner affirmatively to further the purposes of this subchapter." Section 3613, however, permits an aggrieved person to bring suit in federal court only for "an alleged discriminatory housing practice," 42 U.S.C. § 3613(a), and Section 3602 defines a discriminatory housing practice as an act unlawful under Sections 3604, 3605, 3606 or 3617. 42 U.S.C. § 3602(f). Thus, the statute by its terms does not provide a right to sue for an alleged violation of Section 3608. *See* 42 U.S.C. §§ 3602(f), 3602(i), 3613.

1986); *Lee v. Pierce,* 698 F.Supp. 332, 342 (D.D.C.1988). There are several reasons for this conclusion. First, Congress specifically created a judicial remedy for discrimination in housing under Sections 3604, 3605, 3606 and 3617 of Title VIII. Second, Title VIII provides avenues for relief through the Attorney General and the Secretary of HUD that may lead to judicial relief. Third, there is no indication that Congress intended that in addition to these statutory remedies, a grievant would also have a private right of action or that to infer such a cause of action would be consistent with the legislative scheme. *Latinos Unidos De Chelsea v. Secretary of Housing and Urban Development,* 799 F.2d at 792–93; *see Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975).[9] This Court also concludes that plaintiff may not assert jurisdiction under 42 U.S.C. § 3608(d) through an implied private right of action.

### 3. *Alleged Violations of the Administrative Procedure Act*

■ The APA creates a presumption that agency action is subject to judicial review. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1510–11, 18 L.Ed.2d 681 (1967). An agency's refusal to take a particular requested enforcement action, however, is uniquely not susceptible to judicial review:

> This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion. This recognition is attributable in no small part to the general unsuitability for judicial review of agency decisions to refuse enforcement.

*Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985) (internal citations omitted); *see NAACP v. Secretary of Housing and Urban Development,* 817 F.2d at 158.

9. While there might theoretically be special circumstances that would justify implying a private right of action against the federal government in

■ Furthermore, judicial review is not available under the APA where: "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). There is nothing in Title VIII to suggest that judicial review is specifically precluded by Section 701(a)(1) of the APA. The Court finds, however, that insofar as plaintiff challenges the OCC's approval of FNBC's acquisition of Wolcott as not in accordance with Section 3608(d) of the Fair Housing Act, such a challenge is barred by Section 701(a)(2) of the APA because "there is no law to apply" in assessing the agency's action in this particular circumstance. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971).

■ Judicial review of agency action is unavailable "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. at 830, 105 S.Ct. at 1655. To the extent that plaintiff seeks review of the particular decision of the OCC to approve FNBC's acquisition of Wolcott as inconsistent with the OCC's responsibilities under the Fair Housing Act, the Court concludes that Section 3608(d) lacks any "judicially manageable standard ... for judging how and when an agency should exercise its discretion." *Id.* The Court therefore concludes that judicial review is unavailable to plaintiff under the APA with respect to the OCC's approval of FNBC's acquisition of Wolcott.

■ Judicial review is available under the APA, however, with respect to plaintiff's allegation that the OCC has failed generally and programmatically to fulfill the mandate of Section 3608(d). Although the Court may lack sufficiently meaningful standards with which to assess the OCC's approval of one bank's acquisition of a subsidiary, the Court does not lack the necessary standards to determine whether the OCC's overall efforts under the Fair Housing Act are consistent with its statutory mandate. *See, e.g., Lee v. Pierce,* 698 F.Supp. at 342. Indeed, those

other contexts, no such circumstances are present here. *NAACP v. Secretary of Housing and Urban Development,* 817 F.2d at 153–54.

standards are provided by the APA itself: Has the agency acted arbitrarily or capriciously, abused its discretion, or otherwise acted in violation of the law? *See* 5 U.S.C. § 706(2)(A). The standard for reviewing the programmatic failures plaintiff alleges can be drawn directly from the OCC's statutory obligation to administer its programs and activities "in a manner affirmatively to further the purposes" of fair housing. *See* 42 U.S.C. § 3608(d); *NAACP v. Secretary of Housing and Urban Development,* 817 F.2d at 154–60. The Court therefore concludes that it has jurisdiction over this prong of plaintiff's APA claim. The remaining question is whether plaintiff's claim can survive a motion for summary judgment.

### B. *Plaintiff's APA Challenge to Defendant's Alleged Programmatic Failures under the Fair Housing Act.*

■■■■ Plaintiff alleges that defendant has failed to meet its statutory obligations to further the purposes of the Fair Housing Act. Whether an agency has failed in general to live up to its statutory obligations may be a difficult decision in "borderline instances, yet a court should be able to determine a clear failure to live up to the instruction over time." *NAACP v. Secretary of Housing and Urban Development,* 817 F.2d at 158. "[T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. at 416, 91 S.Ct. at 824. Indeed, a court's

review of agency action that has allegedly failed to live up to a statutory obligation over time "need not involve the court in 'superintend[ing] economic and managerial decisions,' ... or in reweighing matter that Congress asked [the agency] to balance ." *NAACP v. Secretary of Housing and Urban Development,* 817 F.2d at 158.

■■■ With the deferential APA standard of review in mind, the Court finds that the manner in which the OCC handled plaintiff's complaint regarding FNBC's acquisition of Wolcott is in itself substantial evidence that the OCC has met its statutory mandate to further the goals of the Fair Housing Act. The OCC thoroughly considered and investigated the general allegations that plaintiff put forth in his complaint regarding FNBC's acquisition of Wolcott. The OCC staff devoted considerable time to plaintiff's complaint, using his specific complaint against the FNBC acquisition to investigate two wholly separate FCC bank mergers about which plaintiff had never complained. OCC staff also personally visited plaintiff. They did this despite the fact that plaintiff's complaint was received in response to an administrative act that was not even open to public comment. *See supra* at 199–201.

Although plaintiff offers several broad accusations in his complaint, he provides no relevant evidence that would dispute the OCC's apparently respectable history in the area of monitoring banks for compliance with the Fair Housing Act.[10] Plaintiff focuses on

---

**10.** The evidence before the Court is that the OCC has implemented a program to promote fair lending pursuant to Section 3608(d) of the Fair Housing Act. The OCC conducts periodic examinations of all institutions that it supervises for Fair Housing Act compliance to determine whether unlawful discrimination has occurred at a national bank. Declaration of Charles C. Lambert at ¶ 4. The OCC has also developed guidelines for detecting unlawful discriminatory practices through the bank examination process by national banks. *Id.;* Def.'s Opp'n, Ex. 1 (May 1, 1996 letter to Elizabeth K. Julian, Acting Deputy Secretary for Policies and Initiatives, HUD); Ex. 2 (OCC Examining Issuance dated April 30, 1993). It refers all Fair Housing complaints to HUD for investigation and a determination, and if the agency discovers that there is a pattern or practice of unlawful discrimination in violation of the Fair Housing Act, it notifies the Attorney General. Declaration of Charles C. Lambert at

¶¶ 5,6; Def.'s Opp'n, Ex. 3 (Memorandum of Understanding between HUD and the Federal Financial Institutions Examination Council executed by the OCC on Nov. 15, 1991); Ex. 4 (OCC Advisory Letter 95–8 dated November 22, 1995). The OCC also spearheaded the Interagency Task Force on Fair Lending, established in March 1994 and participates in banking industry education efforts through conferences and other events and publication of papers and issuances regarding fair lending to examiners and banks. Declaration of Charles C. Lambert at ¶¶ 8, 9; Def.'s Opp'n, Exs. 5, 6 (OCC Bulletin Nos. OCC 94–30 and OCC 94–29, describing task force policy statement and fair lending seminars). The OCC apparently is the only banking agency to use matched pair testing to detect possible lending discrimination at the preapplication stage of the credit process and has encouraged self-testing by national banks. Declaration of Charles C.

the manner in which the OCC processed his complaint regarding FNBC's notice to acquire a specific subsidiary. The fact that the OCC eventually approved the acquisition of Wolcott by FNBC and the mergers of two FCC affiliate banks after investigating plaintiff's allegations of discriminatory practices does not prove that the OCC has failed to live up to its obligations under the Fair Housing Act. The various programs and other actions the OCC has taken in order to promote fair lending practices speak to the contrary.

Although the Court can understand plaintiff's frustration with respect to his inability to obtain a loan to make sewage system improvements in the Plaisance community, plaintiff's frustration with the OCC appears misdirected. It should be directed at the banks that have allegedly discriminated against him.[11] The OCC has not denied plaintiff financing, nor has it decreased plaintiff's ability to gain financing through its programs or actions. The Court therefore enters summary judgment for defendant.

SO ORDERED.

Lambert at ¶ 10; Def.'s Opp'n, Ex. 7 (OCC Bulletin 95–51).

**11.** In 1993, the OCC notified plaintiff of his ability to privately sue another FCC-affiliated bank under the Equal Credit Opportunity Act or the

Fair Housing Act for the alleged discrimination of which he complained. Admin. Rec., Vol. 2, 1082 (October 18, 1993 letter to Rev. Joseph Jones from Lawrence Riedman, Fair Lending Specialist, OCC).